1837.

MANICE
*v.*
THE NEW-YORK
DRY DOCK CO.

---

## MANICE and others *v.* THE NEW-YORK DRY DOCK COMPANY.

Denials of usury in an answer will not be effectual, where facts admitted lead to the conclusion of usury.

M. & Co. required bills of exchange on England and it was agreed by the D. D. Company to draw them at a premium and on a credit of sixty days, adding six per cent. interest for the time of credit and M. & Co. were to give their notes at sixty days for the amount of the bills and premium with interest and deposit other notes as collateral security: *Held*, that this was a sale of the bills of exchange and not a loan and forbearance whereby any usury attached.

---

THIS cause came up on a motion to dissolve the injunction. Such motion being made on bill and answer.

The facts, as they appeared on the pleadings, were these :— on the twenty-third day of February, one thousand eight hundred and thirty-seven, the complainants, composing a mercantile house in the city of New-York, having occasion to make remittances to England, applied to the defendants, the New-York Dry Dock Company, for bills of exchange on London, to the amount of four thousand pounds sterling.   These de-

*October* 16,
1837.

*Usury.*
*Bills of*
*Exchange.*

fendants agreed to draw bills to that amount, at a premium or advance of thirteen and one quarter per cent., on a credit of sixty days upon the adding of interest at six per cent. per annum for the period of credit and the complainants giving their promissory notes, payable at sixty days, for the amount of the bills and the premium, with interest included, and they to deposit with the defendants promissory notes of third persons as collateral security. Accordingly, and on the said twenty-third of February, one thousand eight hundred and thirty-seven, the defendants did draw three sets of bills of exchange, one for one thousand pounds and the other two for fifteen hundred pounds each in favor of the complainants on the house of Wilson & Co. of London, payable at sixty days' sight; and received from the complainants, in payment, their three promissory notes payable sixty days after date for the aggregate amount of the bills, the premium of thirteen and a quarter per cent. and the interest at six per cent. for the time the notes had to run, making, in all, twenty thousand three hundred and forty-four dollars and sixty-four cents. And, as collateral security for the payment of the notes, the complainants endorsed and delivered to the defendants various promissory notes, which they held against other persons, to an amount sufficient to cover their own notes.

It was alleged in the bill and admitted by the answer that, at the time of the transaction, the current rate of exchange upon England, in the city of New York, was from nine to nine and a half per cent., when bills were sold for cash. The answer stated that, at the same time, the price of exchange when sold upon a credit of sixty days was from thirteen to fourteen per cent., adding interest for the period of credit; and the difference for cash or upon a credit of sixty days being from three to four per cent. The bill alleged that this difference, charged by the defendants, was a device or shift resorted to by the latter on the sale of the bills to obtain more than lawful interest during the period of the credit, that is to say about two per cent. per month upon the face of the bills, and that the whole was a corrupt, usurious and illegal agreement. The answer, however, denied that the sale or purchase of the bills of exchange was in pursuance of any corrupt, usurious or illegal agreement, or that there was any device, shift or con-

trivance to evade the statute against usury. On the contrary, the defendants said (in their answer) that the thirteen and one quarter per cent. contained merely the difference between the then market price of bills sold for cash and those sold on a credit of sixty days. The defendants admitted that the three bills of exchange sold to the complainants were drawn upon an uncovered credit; and also said that, in consequence thereof, the defendants were obliged and did run the risk of the rise in exchange when it should become necessary for them to remit to England to cover the bills; and that afterwards, in the month of April, when it became necessary for them to make remittances to meet the payment of the bills so sold, they were obliged to pay eleven and a half per cent. premium for bills, in cash, which was less than the current cash rate of exchange at that time. And further, that, upon the sale of the bills to the complainants, the defendants paid a broker's commission of one quarter per cent., and they were also obliged to pay a banker's commission in England of one half of one per cent. and interest.

It was admitted that the bills of exchange sold to the complainants were duly paid at maturity in England.

An answer under oath was waived.

The complainants endeavored to avoid the payment of their notes given upon the purchase of the bills, and sought to get back the collateral securities on the ground of usury in the transaction. Their bill asked that their three notes might be declared void and the securities returned, and for an injunction, in the meanwhile, to prevent the defendants from proceeding at law to enforce payment.

Mr. *Crist* and Mr. *D. Lord, Jr.,* for the defendants.
*Cases cited and works referred to :* 1 Bos. & P. 144 ; 3 Wend. 296 ; 10 Ib. 116 ; 19 J. R. 496 ; 5 Cowen, 144 ; 9 Peters, 378 ; 7 Barn. & Cress. 458 ; 4 Bing. 81 ; Comyn on Usury, 55, 56 ; 3 Moore & Payne, 130 ; 5 Mumf. 187 ; 6 Ib. 472.

Mr. *Griffin* and Mr. *R. M. Sherman,* for the complainants.
*Cases and works referred to :* 2 Cowen, 664 ; Comyn on

1837.

MANICE
*v.*
THE NEW-YORK
DRY DOCK CO.

1837.

MANICE
*v.*
THE NEW-YORK
DRY DOCK CO.

Oct. 5,
1838.

Usury, 34; 4 J. C. R. 497; 13 J. R. 40; 16 Ib. 367; 1 Chitty on Bills, 1; 3 Kent's Com. 74, 75; 7 Wend. 569; Cro. Jac. 507; 2 R. S. 600.

THE VICE-CHANCELLOR:—This is probably a case where, if usury does exist, the complainants, waiving, as they do, a discovery and answer from the defendants under oath, were at liberty, however unconscionable it may seem to be, to come into this court for relief, without paying or offering to pay any part of the notes or offering to refund the money actually received by them upon the bills of exchange. The defendants having the power in their own hands to obtain payment by means of the collateral securities, without giving the complainants the opportunity of setting up the defence of usury at law, brings this case within the rule of *Harris* v. *Livingston*, 3 Paige, 528, and 11 Wendell, 329, on this point. The complainants are, therefore, at liberty to come into this court in the manner they do, provided it is a case of usury. I agree with the counsel for the complainants, that the denial of a corrupt, usurious and illegal agreement or of a device, shift or contrivance to evade the statute, can have little or no effect, if, from the facts which are admitted, it necessarily follows that the statute has been violated. Such denials are not, therefore, to be deemed denials of matters of fact, but of the inferences of law from the facts; of which the court must judge and not the parties for themselves.

Is this, then, a case of usury according to the facts disclosed by the pleadings? The drawing and sale of a bill of exchange, in the ordinary course of mercantile business, at a premium or price exceeding the *par* value, when that price is regulated by the state of trade between the place where the bill is drawn and the place where it is to be paid, has never yet, to my knowledge, been deemed a usurious transaction. A bill of exchange drawn upon funds, which the drawer has in the hands of the person on whom it is drawn, or drawn upon the strength of a credit which he has with such person, operates, according to my understanding of it, as a sale and transfer of the amount of money for which the bill is drawn. If that money is in another state or country, it is more or less valuable to the

owner or person entitled to draw for it; this value depend-
ing on a variety of circumstances, such as the state of
trade, the demand for funds abroad, the facility afforded by
commercial intercourse for bringing the funds home, and
the expense and risk of transportation. The less these dif-
ficulties are, and the greater the demand, the more valua-
ble will be the foreign funds to the owner; and, like any
other commodity, he may sell them for the best price he
can obtain. In well regulated mercantile communities,
both foreign and domestic exchange, like every thing else
which is the subject of negotiation and sale, will have a
determinate market value, varying, however, from time to
time, according to the demand and the fluctuations of trade.
When, therefore, a man draws and sells a bill of exchange, it
seems to me perfectly consistent with the nature of the
transaction to consider him as selling funds which he has or
is entitled to in the hands of the drawee or acceptor at the
place where the bill is to be paid; and to regard the bill itsel
merely as the instrument by which those funds are transferred
to the purchaser or subsequent holder of the bill. Such a
transaction is not, then, the lending and borrowing of money,
but a sale of foreign or absent funds; and however high the
market price may be, it cannot give rise to the question, whe-
ther excessive interest has been taken upon a loan or for the
forbearance of money (both of which are essential to usury):
because, there is no lending and borrowing in the transaction
and no indebtedness or forbearance, except what results from
the bill itself governed by the law merchant applicable to ne-
gotiable paper.

I will not deny, however, that there may be cases of lend-
ing and borrowing carried into effect by the drawing of bills
of exchange; as, where one man has funds abroad and ano-
ther, having occasion for money at that place, applies to bor-
row it and the owner agrees to lend it to him upon certain
terms; and then, for the purpose of carrying the agreement
into effect and placing the borrower in possession of the mo
ney, the lender gives him a draft or order, in the form of a bill
of exchange, upon his banker or correspondent abroad. Here,
the application and agreement, being for a loan, would be sub-
ject to the law against taking excessive or usurious interest,

1837.

MANICE
v.
THE NEW-YORK
DRY DOCK CO.

either at the place where the contract is made or where it is to be fulfilled. But such is not the present case. The application, on the part of the complainants, was not to borrow money or effect a loan, but to purchase bills of exchange. Such is the plain import of the complainants' allegations; and the defendants' answer expressly says, that the application was to purchase from them certain bills of exchange upon credit, and that the agreement was to sell them bills upon the terms as to premium, credit and security before mentioned. It appears to me there is a manifest distinction between an agreement for the sale and purchase of bills of exchange, which, as I have said, is virtually selling funds abroad, and an agreement for the loan of money, though the latter may be the subject of a bill of exchange for the purpose of putting the borrower in possession and that we must be careful not to confound the one case with the other. If the money, for which a bill is drawn, is in all cases to be deemed lent money, and the transaction that of a loan, then I apprehend in no case will the drawer of a bill be perfectly safe and free from the imputation of usury, where the difference of exchange, which he receives by way of premium on the *par* value of the bill, however well founded that difference may be, and however just and necessary it may be for the sake of trade to allow it, happens to exceed the amount of lawful interest for the time the bill has to run before maturity. I cannot, therefore, agree to the proposition, that the drawing of a bill of exchange, by which money abroad is transferred to the holder of the bill, is a loan or advance of money, unless indeed the transaction is founded upon an express agreement for a loan.

In the absence of such an agreement, and when a bill is drawn to be used for the ordinary purpose of remittance, and, with that view, is purchased at the current rate of exchange and the amount either paid or secured, it has none of the characteristics of a loan or advance of money by the drawer.

But the question still remains, whether there is not usury in the transaction we are now considering, arising from the credit price charged for the bill, and from reserving interest, at the rate of six per cent., for the period of such credit in addition? There is some plausibility, at least, in the argument,

that the difference between the cash price and the credit price of bills, which, in this instance, was from three to four per cent., is but a cover for usury; that there is no other reason for the difference, where interest is also charged, than, to use the common phrase, "the value of money in Wall street;" that where there is a deficiency of circulating medium, so as to cause what is called "a scarcity of money," and money is said to be worth one, two or three per cent. a month and some are found ready to lend and others, in needy circumstances, to borrow at those rates of interest, these circumstances enter into the consideration of parties in making the difference between a cash price and a credit price, such as was charged in this transaction. I confess it looks very much as though this was the inducement, and as if this credit price was regulated by the Wall street standard alluded to. But there may be other circumstances entering into the consideration of parties in fixing this difference of price. In times of great pressure, when confidence in mercantile credit is shaken or impaired, something is due to the hazard of making a bad debt in the sale of property, even when the vendor takes security deemed at the time sufficient; and in making his contract for the price, under such circumstances, he may properly demand more than if he were making a cash sale, though interest also should be charged for the forbearance of payment. It often happens that a man is willing to sell an article of property at a much less price for ready money than on a credit. His own necessities may require the sacrifice; but if he cannot obtain ready money and can get more than the regular cash price by selling on a credit, why may he not sell for the best price he can obtain and give the credit and then make the sacrifice, if necessary, in the conversion of the security he has taken into money? I know of no law to prevent men from making their calculations, based upon the present state of the money market, so called, in regard to the price of any commodity they are about to sell and to fix one price, when payment is to be immediate, and another price when payment is to be postponed; and to graduate the difference by the value attached to the use of money at the time, provided it be a real sale, in good faith, and not a mere cover or disguise for usury upon a

1837.

MANICE
v.
THE NEW-YORK
DRY DOCK CO.

loan. It will be perceived, according to these views, that while this can be regarded as a sale of bills of exchange, and not as a lending and borrowing of money, it is immaterial, as respects the validity of the contract, what was the amount of premium charged or what the difference between a cash and a credit sale or for what cause and upon what principle that difference was made.

That I may not be considered as speaking upon this subject without some authority or precedent, at least, I would refer to three or four English cases cited upon the argument, which appear to me to support these views. The first is *Beete* v. *Bidford*, 7 Barn. & Cress. 45. Lord Tenterden, Ch. J. there observes : " the case presented arises out of a contract for the sale of an estate and not for the loan of money. The agreement was founded, partly, upon what was considered the present price of the estate and partly upon what was considered its price, if paid for at a future day. The only difficulty has been occasioned by calling the difference between the two prices interest ; but it is our duty to look not at the form and words, but at the substance of the transaction. It appears, in substance, to be a contract for the sale of the estate at the price of twenty thousand eight hundred pounds, to be paid by instalments ; in that there was no illegality. The defence therefore fails."

The next is *Stoveld* v. *Eade*, 4 Bing. 81, where A. having a bill for twenty-five thousand pounds payable at two months after date, which he could not readily negotiate in London, requested B. to give him, in exchange, an acceptance of B. a London banker, payable at the same date and for the same sum. B. did so, deducting sixteen pounds and ten shillings by way of commission. And it was held, that there was no pretence for calling the transaction a loan of money ; it was an exchange of bills.

The other, *Evans* v. *Whyle*, 3 Moore and Payne, 130, is a case of an actual discount of bills, which, of course, assumes the character of a loan. There, on the discount of the bills, one half of the amount was paid in cash, and gold, considered as an article of merchandize, was supplied for the other half. On the gold was charged an *extra* price per month, according

to the length of time which the bills had to run; that is, for ready money the price of gold being four pounds and seven shillings per ounce, on a bill at two months four pounds and nine shillings per ounce was charged, and on a bill at three months four pounds and ten shillings per ounce; and so on progressively. Interest was also charged on the money advanced, at the lawful rate of five per cent. The discount of the bills was *bona fide;* and it appeared that no higher charge was made for the gold than if it had been sold on a credit, as it was the universal custom of the trade to charge per ounce an extra shilling per month beyond the ready money price. And it was held, that there was no ground for imputing usury to the party in these transactions.

So, in the case of *Floyer* v. *Edwards,* before Lord Mansfield, Cowp. 112, and Lofft, 595, where one sold goods (gold and silver wire) at three months' credit, under an agreement, at the time of the sale, that, in case the money was not paid at the end of the three months, then the vendee should allow an halfpenny an ounce per month for so long a time as the money should remain unpaid. This allowance was according to the usage in that particular trade, but it exceeded the legal rate of interest. Upon this, an objection was taken to the vendor's right to recover, upon the ground of its being an usurious contract, and meant only as a color to avoid the statute. Lord Mansfield remarks upon the case, that, in the ordinary course of dealing, the one party buys and the other sells a commodity; there is no pretence of any negotiation for a loan; not one word passed about borrowing money; that if a man goes to borrow, under color of buying, the contract might be usurious; but where it is a *bona fide* sale, as in the case before him, it certainly could not oe so considered.

These cases appear to me to establish the distinction between a sale and a loan, which should always be attended to in considering the question of usury; and they show that though, in making a sale, an increased price may be charged where a credit is given, which, upon a loan or for the forbearance of a debt, would amount to usurious interest and avoid the contract, yet, where the contract is in fact a sale, that consequence does not follow.

Believing the case in hand to be one of that description, I must dissolve the injunction. (a)

(a) This cause came to a final hearing before his honor, Assistant Vice-Chancellor Hoffman; and the bill was dismissed, with costs. An appeal was entered; but it is believed that the suit was compromised.