## LEAVITT, receiver &c. vs. DE LAUNY.

Upon a sale of credit made in good faith the vendor may reserve or secure to himself more than seven per cent without rendering the agreement usurious.

A firm having a house in New-York and one at Havre in France, and a part of whose business in New-York was dealing in exchange, drew bills upon the house at Havre payable in the city of Paris, and sold them to a bank in New-York, upon an agreement that the bank, within a certain time, should pay the amount in similar bills, adding interest at seven per cent, and a *commission of one and a quarter per cent.* The bank wanted the bills of the firm in order to dispose of them for money to relieve its necessities, but the evidence failed to show that the transaction on the part of the firm was not a sale in good faith of the bills. *Held* that the agreement was not usurious.

A usurious loan may be disguised under the form of a sale of exchange, but the party impeaching it, must, by evidence, remove the covering, and exhibit the transaction as a loan of money.

[364] IN September, 1841, the plaintiff was appointed by the court of chancery, receiver of the North American Trust and Banking Company, an association organized in July, 1838, in the city of New-York, under the general banking law. In May, 1843, he filed the bill in this cause against Victor De Launy of New-York and John B. De Launy of Havre de Grace, in France, composing the firm of De Launy & Co. · This firm carried on business in both those places, and a part of its business in New-York was drawing and selling bills of exchange upon the firm at Havre, payable at the latter place or at Paris in France.

On the 16th of April, 1841, the Banking Company executed to De Launy & Co. the following agreement:

" New-York, April 16th, 1841.

Received from Messrs. De Launy & Co. their drafts at sixty days' sight on Paris, for two hundred and fifty-three thousand and twelve 86-100 francs (F.253,012.'86) which amount we hereby promise to return them in fifty-five days from this date, in similar drafts to be approved by them, adding interest at the rate of seven per cent per annum, having deposited with them as collateral security sixty-four bonds of the state of Arkansas for one thousand dollars each, twenty North American Trust

and Banking Company bonds, one thousand dollars each, and twenty ditto for five hundred dollars each, with full authority to sell the same, either at public or private sale, immediately after the maturity of this contract and without previous notice to us, in the event of the non-fulfilment on our part of the same or any of its conditions. And we hereby promise to pay forthwith any balance which may be due after said sale. As a farther security on the above we have given Messrs. De Launy & Co. our own note for $13,000 (thirteen thousand dollars) at thirty days' date, the amount of which being paid, is to be invested in a bill on Paris as above stated, and applied in part payment of this obligation.                       THOS. G. TALMAGE."

The object of the bill was to set aside this agreement on the ground of usury, and to recover from the defendants the Arkansas bonds, &c. deposited with them as collateral security. This agreement was a mere continuation or renewal of similar [365] contracts previously executed, which were alledged to be usurious. Two of those contracts were as follows:

"New-York, Jan. 6th, 1841.

We, the North American Trust and Banking Company, of New-York, hereby acknowledge to have this day received from Messrs. De Launy & Co. their drafts at sixty days' sight on Paris, for one hundred and thirty-one thousand nine hundred and eighty-six 02-100 francs, (Fcs. 131,986 02-100,) and we do hereby promise to return Messrs. De Launy & Co. within or at the expiration of fifty-five days from this date, the same amount of francs, say 131,986 02-100, in bills at sixty days' sight on Paris, satisfactory to them, adding interest at the rate of seven per cent per annum, and one and one half per cent commission; having deposited with them as collateral security, thirty-seven bonds of the state of Arkansas for one thousand dollars each ; Nos. 876, 877, 878, 879, 880, 881, 882, 883, 884, 885, 387, 388, 389, 963, 964, 965, 966, 496, 497, 498, 499, 500, 442, 443, 451, 452, 391, 382, 383, 390, 332, 333, 192, 886, 395, 396, 397—and we hereby fully authorize them to sell the whole or any part of said bonds, either at public or private sale, immediately after

the maturity of this contract, in the event of the non-fulfilment on our part of the same or any of its conditions, and we promise to pay forthwith any balance which may be due them in consequence of the proceeds of said bonds not amounting to the face of this note, with interest and commission thereon, as specified above.                                        Thos. G. Talmage,

$25,381,92.                                                            Pres't."

" New-York, Jan. 16th, 1841.

We, the North American Trust and Banking Co. of New-York, hereby acknowledge to have this day received from Messrs. De Launy & Co. their drafts at sixty days' sight on Paris for one hundred and seventy-two thousand eight hundred and fifty-seven 10-000 francs, (Fcs. 172,857 10-100,) and we do hereby promise to return Messrs. De Launy & Co. on or before the 15th day of March next, without grace, the same amount [366] of francs, say 172,857 10-100, in bills at sixty days' sight on Paris, satisfactory to them, adding interest at the rate of seven per cent per annum, and one and one quarter per cent commission, having deposited with them as collateral security twenty-seven bonds of the state of Arkansas, and twenty of the state of Indiana, all for one thousand each—and we do hereby fully authorize them to sell the whole or any part of said bonds, either at public or private sale, immediately after the maturity of this contract, in the event of the non-fulfilment on our part of the same or any of its conditions ; and we promise to pay forthwith any balance which may be due them in consequence of the proceeds of said bonds not amounting to the face of this note, with interest and commission thereon, as specified above.

Thos. G. Talmage."

The two last mentioned contracts were renewed by similar contracts executed on the 2d and 15th days of March, 1841, and finally by the said contract of April 16, 1841, which was still outstanding when the bill was filed.

The bill charged in substance that the said contracts of January 6th and 16th, 1841, were each the result of a negociation between the Banking Company and De Launy & Co. *for a loan* by the latter to the former ; that the bills therein men-

tioned were issued and loaned for the express purpose of being sold in New-York and converted into money in order to relieve the necessities of the bank; and that they were sold and converted accordingly. The bill insisted that the *commissions* charged by De Launy & Co. and agreed to be paid rendered those contracts void for usury.

De Launy & Co. in their answer, which was put in under oath, denied that the transactions were of the character of a loan, or that there was any application to them or negociation for a loan. They alledged that the agents of the bank applied to them to *purchase* the bills on Paris upon the terms specified in the written agreements; that they agreed to sell and did sell the bills to the bank; that they did not know and did not inquire for what use the bills were wanted by the bank, and were ignorant that they were designed to be sold and converted into money. The commissions, they alledged, were agreed [367] to be paid as a compensation for the risks, trouble and expenses of paying the bills in Paris, and the risks, trouble, &c. of remitting to and collecting in Paris the bills which the bank agreed to return to them, including the risk of the non-payment of the last mentioned bills, stamp duties, postage, &c. Such commissions, it was alledged, were no more than fair and reasonable, and all usury was denied.

A replication was put in to the answer, and proofs were taken. The cause was first heard before SANDFORD, assistant vice chancellor of the first circuit, who held the contracts to be usurious. He accordingly directed the agreement of April 16, 1841, which was still outstanding, and the Arkansas bonds and other collateral securities held by the defendants, to be surrendered to the plaintiff. The supreme court in the first district, on appeal, reversed the decree, and directed the bill to be dismissed with costs. The plaintiff appealed to this court.

*S. Beardsley,* for appellant.

*F. B. Cutting,* for respondents.

HARRIS, J. Regarding the transactions set forth in the plead-

ings as sales of exchange, there can be no doubt they are free from usury. Foreign exchange is a commodity which may be bought and sold like merchandize. Its price is governed chiefly by the state of trade between the place where it is negotiated and the place where it is payable. The sale of exchange is, in effect, a transfer of funds, which the drawer has, or is supposed to have, in another country, to the purchaser. Such funds are more or less valuable according to circumstances. Such value is chiefly affected by the state of trade between the country where the funds are owned, and that where they are held. To some extent, also, such value is affected by the time required to transfer funds from one country to the other, and the hazard incurred in making such transfer. Funds thus situated are the subject of commerce. The owner may sell them [368] for the best price he can obtain, without the hazard of having the sale avoided for usury. (*Holford* v. *Blatchford*, 2 *Sandf.* 149; *Manice* v. *The New-York Dry Dock Co.* 3 *Edw.* 143.)

But I agree with the learned assistant vice chancellor by whom this cause was first heard, that these transactions were not sales of exchange, but were loans. There was no price fixed upon the transfer, but the bills were delivered to the Banking Company, upon a contract to return the same amount, *in kind*, at a stipulated time. Can usury be predicated upon such a loan? I think not. It was well said by the counsel for the plaintiff, upon the argument, that "the statute of usury applies only to a loan of money, or to a transfer of something else *as money*, for the purpose, and as the means of obtaining money, on time." A loan, therefore, to be usurious, must be in fact, if not in form, a *loan of money*. But here, unless the transactions were made to assume the shape they bear, merely to disguise their true character, there was no loan of money, either directly or indirectly. The defendants loaned to the Banking Company their bills, payable in Paris; an article of commerce, having no standard price or value, but, like other commodities, subject to the vicissitudes and fluctuations of trade. They were to receive in return, not a specified amount in money, or money's worth, but bills to the same amount, pay-

Leavitt v. De Launy.

able at the same place. Whether they would receive more or less than the value of their bills, with interest, would necessarily depend upon the comparative value of exchange, at the time of the loan, and when it should be repaid. It is very likely that, in the whole series of the transactions between the parties, the advantage was in favor of the defendants; but that no one could foresee this result, or that any one of the transactions would insure to the defendants more than the market value of their exchange, with legal interest, is entirely certain.

The object of the Banking Company in making the loan was undoubtedly, to raise money. Nor have I any doubt that the defendants knew this. If therefore, they had stipulated for the re-payment of the value of the bills loaned, with interest, in money, I am inclined to think the transactions would have been usurious. But this essential element of usury seems [369] to be wanting. Three things must unite to render any contract usurious. First. There must be a loan, either express or implied. Then there must be an agreement that the money lent, or which is the same thing, that which is lent for the purpose of raising money, shall be repaid, and that without condition, or contingency. And, lastly, there must be an agreement to pay a greater rate of interest than that allowed by statute. (*Lloyd* v. *Scott*, 4 *Peters*, 205.) If the contract provide for the payment of the loan with interest, at all events, it is enough to render it usurious, if in addition to the legal interest, it provide for the payment of excessive interest, upon a contingency. A stipulation even for a chance of advantage beyond legal interest, is illegal. (*Cleveland* v. *Loder*, 7 *Paige*, 557.) In *Barnard* v. *Young*, (17 *Vesey*, 44,) the plaintiff having borrowed a sum of money of the defendant, entered into a new agreement when the money became due, stipulating at a certain day to deliver in payment, as much stock as the money would have purchased at the time the agreement was made, or the money, at the option of the lender, and, in the mean time to pay lawful interest on the principal sum. In giving judgment the court said, "the lender is at the election to have his principal and interest, or to have a given quantity of stock transferred to him. His

principal never was in any hazard, as he was, at all events, sure of having that, with legal interest, and had a chance of an advantage if stock rose. It was usurious to stipulate for that chance. In fact, the stock did rise, and if the contract had been performed he would have had principal and interest, and a very large premium." So in *White* v. *Wright*, (3 *Barn. & Cress.* 273.) White, at the instance and for the accommodation of Wright, had sold £400 of 3 per cent stocks. The money was lent to Wright. The lender reserved to himself the dividends upon the stock by way of interest, and the option of deciding within a year, whether he would have the stock replaced, or have the amount for which it had sold, repaid in money, with interest. It was held, that, inasmuch as the lender, after receiving interest on his money, might, in case of [370] a rise of stocks, require the borrower to replace the stocks sold, and thus obtain a premium for his money, besides principal and interest, the contract was usurious. Bailey, J. said, " a party may lawfully lend stock, *as stock*, to be replaced, or he may lend the produce of it, as money, or he may give *the borrower* the option to repay either in the one way or the other. But he cannot legally reserve to himself a right to determine in future, which it shall be. It is not illegal to reserve the dividends by way of interest, for stock lent, although they may amount to more than the legal rate of interest on the produce of it; for the price of stock may fall, and then the borrower would be a gainer, but the option must be made at the time of the loan."

The principle upon which these cases were decided is clearly applicable to that in hand. " A party," says Justice Bailey, " may lawfully lend stock, as stock, to be replaced." So, here, the defendants might lawfully lend exchange, as such, to be replaced in exchange. There can be no difference in principle, between a loan of British consols, and exchange on Paris, or London. They are alike the subjects of commerce. Each has its determinate market value, and that value is liable to the same changes which affect the price of other commodities. In short, both are legal subjects of bargain and sale, as much so

as cotton, or flour. The usurious element in the contracts in both the cases cited, is not to be found in the contracts under consideration. In each of those cases, the lender reserved to himself the right to have the thing lent returned, or to be repaid in money, the price for which it was sold. Here the defendants stipulated for no such advantage. They had no election; they were to have their exchange returned to them, whether it should be worth more or less, and the price agreed upon as a compensation for the loan; nothing more. The transactions may have been, and probably were, in the aggregate, more advantageous to the lenders than the borrowers. This, however, was not enough to render the contract illegal. They were merely contracts to loan exchange. The loan was to be repaid in kind. The case shows, that the price of that kind of exchange was subject to very material fluctuations. Within the period of four months, while the transactions [371] in question were in progress, there was an actual variation of more than six per cent in the price of French exchange. If it happened, as it sometimes did, that the price of exchange, when the time to repay the loan arrived, was materially less than when the loan was made, the company were the gainers by the transaction. It was shown upon the argument, that in several instances the price of exchange had fallen so much, between the time of making the loan and the time of payment, that the exchange returned to the defendants was not worth the amount realized by the company upon the sale of the borrowed exchange, with interest. " With regard to contracts to replace stock at a future day," says Comyn, " it is clear, that if the lender be not certain whether by the stocks being replaced at the given day, he shall be a gainer or loser, any gain which he may obtain by the replacing, will not taint the agreement with usury. But if, on the other hand, he has so made the agreement that he is secure from loss, and has a chance of gain, this, by taking away the *contingency*, deprives the transaction of legality." (*Comyn on Usury*, 114.) Again the same writer says, "usury can only attach to a loan of stock where the party

transferring it receives, or is likely to receive more than the legal rate, and can not by possibility, receive less." (*Id.* 105.)

Suppose that, instead of exchange, the defendants had been dealers in flour, and the Banking Company, for the same purposes for which it borrowed the exchange, had borrowed of the defendants a thousand barrels of flour ; that by the terms of the loan, the same number of barrels were to be returned, at the end of a year, and that the borrower should also pay upon the estimated value of the flour, interest, and one per cent under the name of commission. Assuming the transaction to be what upon its face it purported to be, who would pronounce it usurious ? The lender, on the one hand, would take the risk of a depreciation in the price of flour, and the borrower on the other, would take the risk of an advance. No one would pretend that usury could be predicated upon such a transaction. And yet, if I am right in assuming that exchange is, like merchandise, [372] the subject of bargain and sale, and, even the learned judge who has regarded the transactions in question as usurious, concedes that this is so, I can not see how this case is distinguishable from that supposed. Indeed, I understand it to be a general principle, applicable even to loans of money, that where the lender assumes any risk or hazard, in respect to the money lent, the reservation of a higher rate of interest than that prescribed by law, will not render the contract illegal. (*Comyn on Usury*, 21; *See also Tate* v. *Wellings*, 3 *T. R.* 531; *Pike* v. *Ledwell*, 5 *Esp.* 164; *Maddock* v. *Rumball*, 8 *East*, 304; *Clark* v. *Giraud*, 1 *Mad.* 511; *Spencer* v. *Tilden*, 5 *Cowen*, 144; *Cummings* v. *Williams*, 4 *Wend.* 679.)

The assistant vice chancellor thinks the illustrations from loans of cotton, sugar and other merchandise, to be returned in kind, with compensation, are not pertinent, " because," he says, " all merchandise fluctuates in value, while here the thing to be returned was equivalent to the thing loaned." I confess I am unable to appreciate this distinction. Bills payable in Paris fluctuate in value in the same manner, and probably quite as much as cotton or sugar ; and whether the one or the other is the subject of the loan, the thing to be returned may, or may

Leavitt *v.* De Launy.

not be equivalent in value to the thing loaned. It is true that exchange is made to represent funds at the place where it is payable, and that the money in Paris, represented by the bills loaned, is equivalent to the money in Paris, represented by the bills to be returned in payment of the loan. This may not be the case with cotton or sugar. But has this distinction any proper bearing upon the question in hand? ·Funds in Paris are not, in any practical or legal sense, money in New-York. Such funds can no more be used as money in New-York, than can tea or coffee. Indeed, the latter articles approach nearer to a substitute for money, because they are more extensively in demand. But each, before it can be made to represent money, requires the transforming operation of a sale.

Upon a review of all the evidence in the case, I can see nothing which justifies even a suspicion, that the contracts in question were devised, or designed, to cover usury. On the contrary, every thing seems fair and *bona fide*. The con- [373] tracts were, each of them, bargains of hazard. That hazard was not very unequally divided between the parties. Neither, at the time of any single loan, could foresee with certainty to which of them it would prove most favorable. Whether the Banking Company would pay more or less than legal interest for their accommodation, no one could know. Whether the defendants were to obtain all, or but a part of the value of the bills loaned, in the bills they were to receive in repayment, was to depend upon a contingency yet in the future. In short, the most that can be pretended is, that the arrangement was such, that the defendants were likely, perhaps quite certain, to make a fair gain, but that there was also some chance that they might lose. Such a transaction, involving such contingencies, unless merely colorable, cannot be usurious. Upon this ground therefore, and without reference to the questions presented upon the pleadings, I am of opinion that the decree of the supreme court should be affirmed.

GARDINER, J. The defendants furnished the association with their drafts, payable in Paris at sixty days, the amount of which,

the latter promised to return in fifty-five days from date, in similar drafts, (to be approved by the defendants,) adding interest at 7 per cent. This, in substance, was the agreement of the 16th of April, 1841.

The previous contracts between the parties, in addition to the terms above stated, contained a provision for a commission of 1½ and 2 per cent, to be paid to the defendants. The several agreements, in form, were sales, or exchanges of the bills of the defendants, for other bills of a similar character, to be delivered by the association, within a stipulated period. There was no application or treaty for a loan of money.

The defendants were regular dealers in exchange, and their answer in response to the bill alledges, that the application to them by the Banking Co. was for the *purchase* of bills of exchange, and that the defendants in pursuance thereof, agreed to sell and did sell such bills accordingly. The answer in this re-[374] spect, so far from being disproved, is sustained by the written agreement of the parties. The question then, arising upon the contracts prior to that of the 16th of April, in the form most favorable to the complainants, is simply, whether upon a sale of credit, made in good faith, the vendor can reserve or secure to himself more than 7 per cent without rendering the agreement usurious. This question was substantially decided in the affirmative, in the case of the Dry Dock Bank, (3 *Comst.* 344,) and by previous adjudications in this state, to which reference is there made. It is not denied that a sale of exchange, in form, may be adopted as a cloak for an usurious loan. But the party impeaching an agreement upon this ground, must, by evidence, remove the covering from the transaction, and exhibit it as a loan of money. He makes no progress in this work when he stops with proving that he proposed to purchase bills, and subsequently put his proposition into the form of a written agreement. This is the whole effect, as I think, of the complainant's evidence, viewed in connection with the answer of the defendants. It is unnecessary, therefore, to consider the other questions presented by the defence, as the decree of the supreme court must be affirmed for the reasons suggested.

And, thereupon, for the reasons stated in the opinion of GAR-DINER, J. and without passing upon other questions, the decree of the supreme court was affirmed.